IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FEDERAL NATIONAL          )
MORTGAGE ASSOCIATION,     )
    Plaintiff,            )
                          )
        v.               )    Civil No. 3:13-cv-39 (DJN)
                          )
CG BELLKOR, LLC, *et al.*, )
    Defendants.           )
_____)

MEMORANDUM OPINION

The parties come before the Court by consent pursuant to 28 U.S.C. § 636(c)(1) on

Plaintiff's Motion for Summary Judgment (ECF No. 90) and Defendants' Motion for Partial

Summary Judgment (ECF No. 92). Both parties have briefed the issues extensively, making the

matter ripe for review.

Defendant CG Bellkor, LLC ("Bellkor") signed a promissory note to purchase a piece of

property. Defendant Jonathan Bell ("Bell") signed a guaranty to that promissory note, agreeing to

be personally liable for Bellkor's liability under the note. Bellkor subsequently defaulted on the

note. Plaintiff Federal National Mortgage Association ("Fannie Mae") then brought this action. As

of this time, the Court must determine whether Defendants face personal liability on the promissory

note — the only issue remaining.

Generally, as a non-recourse promissory note, Bellkor would not have any personal liability

for a default. Because Bell's guaranty only applies to Bellkor's personal liability on the promissory

note, Bell enjoys the same non-recourse protections that Bellkor does. The promissory note,

however, contains carve-outs which give rise to personally liability under the promissory note. The

promissory note defines one such carve-out as a "transfer" of the property under the terms of an

accompanying security instrument. If a "transfer" did occur, Bellkor, under the promissory note, and Bell, under his guaranty, become personally liable. To resolve the final issue of personal liability, therefore, the Court must determine whether a "transfer" occurred when the City of Richmond ("City") placed liens on the property.

Little dispute exists between the parties as to the underlying facts. Instead, the parties quarrel over the implications of liens levied on the property by the City after Bellkor failed to pay utility bills. Fannie Mae asserts that the lodging of the liens by the City placed Defendants in default under the terms of the promissory note. Because the Court agrees with Fannie Mae, the Court GRANTS Plaintiff's Motion for Summary Judgment (ECF No. 90) in part and DENIES Defendants' Motion for Partial Summary Judgment (ECF No. 92).

## I. Background

### A. Summary of Facts

1. The Purchase of the Property and Execution of the Note.

Bellkor, owned and managed by Bell, owned a 216-unit apartment complex in Richmond known as Chamberlayne Gardens (the "Property") from December 2007 until 2013. (Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. "Pl.'s Mem." (ECF No. 91) at 2-3.)[1] Bell and his wife constitute the only shareholders of OHI Properties, LLC, the only member of Chamberlayne Partners, LLC, which serves as the managing member of Bellkor. (Pl.'s Mem. at 2-3.)

On December 12, 2007, Bellkor obtained an $8,300,000 commercial loan from Amerisphere Multifamily Finance, LLC. (Multifamily Non-Recourse Fixed Rate Note "Note" (ECF No. 79-1) at

---

[1] Pursuant to Local Rule 56(B), each brief in support of a motion for summary judgment must contain a section listing all undisputed material facts. E.D. Va. Loc. R. 56(B). Briefs in response to such motions must contain a section listing those facts "as to which it is contended that there exists a genuine issue necessary to be litigated." *Id.* The Court will deem facts identified for the moving party admitted unless controverted by the non-moving party. *Id.* Here, Defendants objected to several of Plaintiff's undisputed facts. (Defs.' Am. and Supplemental Opp'n to Pl.'s Mot. for Summ. J. "Defs.' Opp'n" (ECF No. 111) at 2-5.) Defendants did not dispute those facts cited by the Court. Where Defendants dispute certain facts, the Court will note accordingly.

1.) The loan was evidenced by a Multifamily Note (the "Note"). Bellkor generally faces no personal liability on the non-recourse Note, but certain carve-outs in Paragraph 9 give rise to Bellkor's personal liability. (Note ¶ 9.) Further, a Multifamily Deed of Trust, Assignment of Rents and Security Agreement ("Security Instrument") secures the Note in part. (Security Instrument (ECF No. 91-2) at 1.) Bell signed both the Note and the Security Instrument on behalf of Bellkor. (Note at 10; Security Instrument at 35.) Bell also executed an Acknowledgment and Agreement of Key Principal to Personal Liability ("Guaranty"), stating that he "absolutely, unconditionally, and irrevocably agree[d] to pay to [Fannie Mae], on demand, all amounts for which [Bellkor] is personally liable under Paragraph 9 of the Multifamily Note." (Guaranty at 1.) On December 12, 2007, Amerisphere assigned the Note, Security Instrument and all other loan documents to Fannie Mae. (Pl.'s Mem. at 3.)

In executing the Security Instrument, Bellkor assigned its interests in rents from the Property to Fannie Mae. (Security Instrument § 3(a).) Before an event in default, Bellkor held a revocable license to collect and receive rents to hold in trust and "to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums." (*Id.* § 3(b).) After an event in default, Bellkor "shall, upon [Bellkor]'s receipt of any Rents from any sources . . . pay the total amount of such receipts to the Lender." (*Id.*)

Paragraph 9 of the Note provides that, upon the occurrence of certain specified events of default, Bellkor faces personal liability for all of the indebtedness under the Note. (Note ¶ 9(c).) Paragraph 9 specifies that a "transfer" under Section 21 of the Security Instrument constitutes one such event of default. (*Id.*) The Security Instrument defines a "transfer" as not only the "sale, assignment, transfer or other disposition," but also "the granting, creating, or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law)." (Security Instrument §§ 1(z), 21(a)(1).) The Note defines indebtedness as "the principal of, interest

3

on, or any other amounts due at any time under, this Note, the Security Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances." (Note ¶ 1.)  In the event that Fannie Mae accelerated the Note and sold the Property to repay a portion of the loan, the Note specified that a prepayment premium would apply. (Note ¶¶ 10(a)(2), 10(a)(3).)

The Note also required Bellkor to make monthly payments of principal and interest on the first day of each month. (*Id.* ¶ 1.)  Bellkor's failure to make payments when due constituted an event of default under the Note and the Security Instrument. (Security Instrument § 22.)  After ten days of nonpayment, late fees began to accrue, and after thirty days of nonpayment, Fannie Mae could charge interest at the default rate under the Note. (Note ¶¶ 7-8.)

### 2.  The Filing of the Liens.

Bellkor contracted with the City for utility services. (Mem. in Supp. of Def.'s Mot. for Partial Summ. J. "Defs.' Mem." (ECF No. 93) at 5.)  By September 2011, Bellkor had become delinquent on its payments to the City for water and sewer services. (Pl.'s Mem. at 5.)  On November 8, 2011, Bellkor received an email from Carolyn Cunningham, a customer representative in the billing department of the City's Department of Public Utilities, notifying Bellkor of the delinquency on amounts owed for the four-month period ending October 27, 2011, and stating that "a lien against the property is being filed but I will work with you to avoid disconnection of service." (Defs.' Mem. at 5; Defs.' Supplement to Motion for Summ. J. (ECF No. 132) at 1.)  The City subsequently recorded three utility liens against the property, dated December 8, 2011, March 1, 2012, and April 27, 2012. (Pl.'s Mem. at 5.)  On September 18, 2012, John Worden, an employee of the loan servicer Amerisphere, emailed Bellkor, informing Bellkor that at least one of

the utility liens remained on the Property. (Pl.'s Mem. at 5.)[2]  On December 7, 2012, the City

released the liens dated December 8, 2011, and March 1, 2012, and on June 28, 2013, the City

released the lien dated April 27, 2012.  (Pl.'s Mem. at 6.)

      3.  Bellkor Defaults on the Note.

    Beginning in June 2012, Bellkor stopped making timely payments on the Note.  (Pl.'s Mem.

at 6.)  On July 2, 2012, Amerisphere, on behalf of Fannie Mae, provided notice to Bellkor of its

default under the loan documents and demanded that Bellkor immediately bring the Note current by

paying the $104,559.98 due at that time.  (Pl.'s Mem. at 7.)  Bellkor failed to do so.  (Pl.'s Mem. at

7.)  Further, Fannie Mae informed Bellkor that its license to collect rents had been terminated.

(Pl.'s Mem. at 9.)  After October 2012, Bellkor did not tender any funds on the loan to Amerisphere

or to Fannie Mae. (Pl.'s Mem. at 7.)  On November 8, 2012, Fannie Mae accelerated the loan and

declared the entire balance of the loan immediately due and payable as provided by Paragraph 10 of

the Note. (Pl.'s Mem. at 7.)  Additionally, Fannie Mae instructed Bellkor that it could only apply

collected rents to bona fide operating expenses. (Pl.'s Mem. at 9.)

    Fannie Mae alleges that following this default, Bellkor continued to use funds from the rents

to make payments to OHI Management, to pay health insurance premiums for himself, his wife and

his stepfather, to have the Property appraised and to defend the current lawsuit. (Pl.'s Mem. at 9-

13.)  To the extent that Defendants dispute the facts alleged by Fannie Mae regarding payments,

Defendants dispute whether the payments constituted authorized payments or legitimate operating

---

[2]    Though Bellkor lists this fact as disputed in Defendants' Amended and Supplemental Opposition to Plaintiff's Motion for Summary Judgment, Bellkor does not dispute that Bellkor received the email. Fannie Mae stated that "[o]n September 18, 2012, Bellkor received notice from John Worden, an employee of Amerisphere (which was now the servicer for the Loan), informing Bellkor that at least one of these utility liens remained recorded against the Mortgaged Property." (Pl.'s Mem. at 5.) Bellkor responded: "Disputed: Mr. Worden's September 28, 2012 e-mail was Bellkor's first notice that any liens had been recorded against the Property, other than Fannie Mae's own mortgage lien." (Defs.' Opp'n at 2.) Thus, Bellkor does not dispute receiving the email. Bellkor merely claims that the email provided Bellkor with notice of the liens for the first time.

expenses — not whether Defendants actually made the payments.  For example, Fannie Mae asserts that Bellkor made certain payments, because OHI Management, LLC ("OHI Management") — manager of the Property — believed that it would never get paid and that those payments were not authorized.  (Pl.'s Mem. at 10.)  Defendants dispute this fact, saying only that Bellkor did not need approval and that "[a]ll payments disputed in Fannie Mae's Motion for Summary Judgment were legitimate operating expenses."  (Defs.' Opp'n at 4.)  The parties, therefore, do not dispute whether Bellkor made those payments.  Rather, the parties dispute the consequences of such payments.

While Bellkor owned the Property, OHI Management managed the Property.  (Pl.'s Mem. at 9.)  Bellkor paid the health insurance premiums for Bell, his wife Heather Bell and his stepfather Steve Carroll.  (Pl.'s Mem. at 11.)  Between July 2012 and February 2013, Bellkor made payments to United Healthcare totaling $30,881.12.  (Pl.'s Mem. at 11.)  Between December 2012 and March 2013, Bellkor used rents to pay for legal representation in this matter.  (Pl.'s Mem. at 13.)  While Bellkor and Bell maintain joint representation in this matter, Bellkor acknowledged that payments for Bell's representation did not qualify as operating expenses of the Property.  (Defs.' Opp'n at 5.)  On February 28, 2013, Bellkor paid $2,750 for an appraisal of the Property.  (Pl.'s Mem. at 13.)

In February and March 2013, Bellkor made payments totaling $42,464.31 to OHI Management.  (Pl.'s Mem. at 9-10.)  Bellkor claims that it paid OHI Management for invoices from 2009 and 2010.  (Pl.'s Mem. at 10.)  Bellkor, through Bell, made three of these payments after the Court issued a Memorandum Order prohibiting Defendants from "otherwise disposing of funds . . . derived from the operation of the Property and from paying such funds to or for the benefit of themselves or any other party." (Mem. Order (ECF No. 58) at 6.)  This Court found Bell in civil contempt and ordered him to return $17,959.67 — the amount withdrawn in violation of the Court's Order.  (Order (ECF No. 131) at 2.)  Bell neither returned the $17,959.67 nor provided Fannie Mae

6

access to his financial documents as required by the Order.  (Pl.'s Status Report Regarding Jonathan

Bell's Resp. to August 27, 2013 Order (ECF No. 135) at 2.)

> 4. Fannie Mae files this lawsuit.

On November 30, 2012, Fannie Mae filed this lawsuit. (Compl. (ECF No. 1) at 1.)  Fannie

Mae then filed a motion for the appointment of a receiver on December 5, 2012. (ECF No. 4.)  In

December 2012 and January 2013, Amerisphere advanced over $60,000 to pay insurance premiums

and real estate taxes on the Property. (Pl.'s Mem. at 7-8.)  On March 18, 2013, the Court entered a

Memorandum Order appointing a receiver and awarded Fannie Mae injunctive relief, ordering

Defendants to "pay and turn over immediately to the receiver . . . all funds on hand" and enjoining

Defendants from "withdrawing, transferring . . . or otherwise disposing of funds . . . derived from

the operation of the Property and from paying such funds to or for the benefit of themselves or any

other party." (Mem. Order at 6.)  On May 30, 2013, Fannie Mae purchased the Property at a

foreclosure sale with a credit bid of $5.5 million. (Defs.' Mem. at 3.)

Defendants contend that the City's failure to comply with certain procedural requirements

invalidates the liens and, therefore, no "transfer" occurred.  Because no "transfer" occurred,

Defendants contend, Defendant Bellkor cannot be held personally liable on the Note.  Further,

Defendants argue that because Bellkor cannot be held personally liable, Bell cannot be subject to

personal liability under the Guaranty.  Plaintiff argues that creation of the liens constituted a

"transfer" under the terms of the Note, and because a "transfer" occurred, Defendants are personally

liable.

## II. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may appropriately

grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).
The relevant inquiry at the summary judgment stage analyzes "whether the evidence presents a
sufficient disagreement to require submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In
reviewing a motion for summary judgment, the Court must view the facts in the light most
favorable to the non-moving party. *Id.* at 255.

When considering a case for summary judgment, the Court cannot weigh the evidence to
enter a judgment, but simply must determine if a genuine issue exists for trial. *Greater Balt. Ctr.
for Pregnancy Concerns v. Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Anderson*, 477
U.S. at 249). Even on cross-motions for summary judgment, a court cannot resolve factual issues, it
can only identify them. *Id.* (citing *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir.
2012)).

Once a party properly makes and supports a motion for summary judgment, the opposing
party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 586-87 (1986). The mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly supported motion for summary judgment;
the requirement provides that no genuine issue of material fact exists. *Anderson*, 477 U.S. at 247-
48.

A material fact may affect the outcome of a party's case. *Id.*; *JKC Holding Co. v. Wash.
Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Substantive law determines a fact's
materiality, and "[o]nly disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248;
*Hooven-Lewis v. Caladera*, 249 F.3d 259, 265 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Indeed, summary judgment must be granted if the non-moving party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, if the adverse party does not provide evidence "establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered regardless of [a]ny proof or evidentiary requirements imposed by the substantive law." *Dash v. Mayweather*, ___ F.3d ___, 2013 WL 5365967, at *4 (4th Cir. Sept. 26, 2013) (quoting *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 522 (4th Cir. 2003)) (alteration in original) (internal quotation marks omitted). To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, sufficiently allows a reasonable jury to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

### III. Discussion

Resolution of the summary judgment motions filed by the parties requires the Court to determine the impact of the filing of the utility liens upon the Note and the Guaranty. To do so, the Court must first determine which state's law applies. Because the Court has jurisdiction based on the diversity of the parties, the Court applies the choice of law rules of Virginia, the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Virginia upholds choice of law clauses in a contract except in unusual circumstances. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999). In this case, the parties agreed that the law of the jurisdiction of the Property's location would govern the Note. (Note ¶ 17.) Because the Property lies in Virginia,

9

the Court will apply Virginia substantive law in reviewing claims and defenses.

In this case, the parties do not dispute the existence of the liens. The parties only dispute the legal consequences of existence. Defendants argue that because the City did not follow procedural requirements in filing the liens, no "transfer" occurred. Plaintiff argues that the City's failure does not affect whether a "transfer" occurred. Turning to the merits of the case, the Court first addresses Defendants' contention that the City did not follow the proper procedure in recording the liens. Second, the Court will address whether the liens constituted a "transfer" under the Security Instrument. Third, the Court will address Bell's personal liability.

A. Creation of the liens.

Defendants argue that they face no personal liability, because the City failed to follow the proper procedure in recording the liens on the Property. At this stage, however, the City's failure to do so does not constitute a material fact, and Defendants inappropriately collaterally attack those liens here. Rather, the issue is the creation of the liens. The Court first addresses Defendants' collateral attack on the City's recordation of the liens. The Court will then address the impact of the liens assuming that that the City did not follow the proper procedure in recording the liens.

1. Defendants' inappropriate collateral attack on the liens.

Even while accepting Defendants' argument that the City did not follow the proper procedure in recording the liens, Defendants make such an argument inappropriately. Defendants argue that Virginia courts tend to construe compliance with statutory liens strictly. *See, e.g., Smith Mt. Bldg. Supply, L.L.C. v. Windstar Props., L.L.C.*, 277 Va. 387, 391, 672 S.E.2d 845, 846 (2009); *Carolina Builders Corp. v. Cenit Equity Co.*, 257 Va. 405, 409, 512 S.E.2d 550, 552 (1999); *Woodington Electric, Inc. v. Lincoln Savings & Loan*, 238 Va. 623, 385 S.E.2d 872 (1989). Defendants fail to mention, however, that these cases involve disputes directly between the lienholder and the debtor concerning the enforcement of the lien before payment thereof. This

10

Court can find no Virginia authority supporting a *post facto* invalidation of a lien via a collateral attack, as Defendants ask for here.

Although this particular Virginia statute has rarely been litigated, the Court notes that in other types of proceedings, debtors wishing to challenge the validity of a lien must file an adversary action against the lienholder. *See, e.g., In re Deutchman*, 192 F.3d 457, 460 (4th Cir. 1999) (debtor wishing to challenge validity or existence of tax liens failed to do so because he sought no adversary hearing and filed no objections); *Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir. 1995) (initiation of adversary proceeding prerequisite to challenging validity or existence of lien against property in Chapter 13 bankruptcy proceeding); *see also, In re Kinion*, 207 F.3d 751, 757 (5th Cir. 2000) (proper procedure for debtor wishing to challenge status of lien was filing of adversary proceeding). Defendants had ample opportunity to challenge these liens directly by filing a proceeding against the City, even if, as Defendants claim, they did not receive notice of the liens until September 2012. Defendants also had the opportunity to join the City in this lawsuit within the requisite time period, but Defendants chose not to do so. Consequently, this Court finds this lawsuit to be an inappropriate forum for Defendants to challenge the validity of these liens.

      2.   Creation of the liens.

Specifically, Defendants argue that the applicable sections of the Code of Virginia require the City to give thirty days notice before recording a lien, so that an owner has a reasonable opportunity to pay the amount due and avoid recordation. (Defs.' Mem. at 9.) Additionally, Defendants state that the Code of Virginia requires that the lien amount may only be applicable to three months or fewer of delinquent rates. (Defs.' Mem. at 9.) Defendants argue that the City's failure to give notice and failure to record for the proper amount void the liens. (Defs.' Mem. at 10-12.) As a result, Defendants argue, the liens cannot constitute a "transfer" under the terms of the Note.

Neither party disputes that Bellkor entered into a contract with the City to provide water, gas and sewer services for the Property. (Defs.' Mem. at 5.)  The City billed Bellkor $52,963.61 for utility services for a four-month period ending October 27, 2011. (Defs.' Mem. at 5.)  On November 8, 2011, Bellkor received an email from Carolyn Cunningham, a customer representative in the billing department of the City's Department of Public Utilities, stating that that a "lien against the property is being filed, but [she] will work with [Defendants] to avoid disconnection of service." (Defs.' Mem. at 5, 11.)  Defendants claim that this "vague" email did not put Defendants on adequate notice under the Code of Virginia. (Defs.' Mem. at 11.)  On December 8, 2011, the City recorded the first lien on the Property for $52,963.61. (Defs.' Mem. at 5.)  On March 1, 2012, the City recorded a second lien on the Property for $84,070.73. (Defs.' Mem. at 6.)  On April 27, 2012, the City recorded the third lien on the Property for $101,518.82. (Defs.' Mem. at 7.)  The City released the first two liens on December 11, 2012, and the third lien on June 28, 2013. (Defs.' Mem. at 7.)  Even assuming that the City did not follow the proper procedure in recording the liens, the existence of the liens is undisputed.

For the purpose of addressing Defendants' claims, the Court will assume that the City did not conform to the procedural requirements when recording the liens; however, the City's procedural compliance is not a material fact in this case.  The applicable section of the Security Instrument defines a "transfer" as the "granting, creating or attachment of a lien." (Security Instrument § 1(z).)  The Security Instrument does not mention procedural compliance of a third-party in perfecting the lien.  Rather, the Security Instrument merely provides that "granting, creating or attachment" of a lien constitutes a transfer. (Security Instrument § 1(z).)

Defendants state that because Bellkor contracted with the City for utilities before July 1, 2012, the provisions of sections 15.2-2119 and 15.2-5139 from 2011 apply. (Defs.' Mem. at 9 n.2.)  Defendants quote those sections in support of their argument that the City had to give notice to

12

Defendants and that the lien amounts may only be applicable to three months of charges; however, Defendants only quote selectively from the statute.

In 2011, Section 15.2-2119 provided that for "sewer service provided by localities, fees and charges may be charged to and collected from" a contracting party. Va. Code § 15.2-2119 (2011). "Such fees and charges, and any penalty and interest thereon *shall constitute a lien against the property* . . . ." *Id.* (emphasis added). Before recording the lien, the locality must give the aforementioned thirty days notice. *Id.* Defendants attempt to characterize the notice requirement as condition precedent to creation of the lien. The statute, however, unambiguously states that fees and charges from the utility services constitute a lien against the property from the time that charges are due.[3]

Similarly, in 2011, section 15.5139 provided that "*[t]here shall be a lien upon real estate for the amount of any fees, rents or other charges* by an authority to the owner or lessee or tenant of the real estate for the use and services of any system of the authority by or in connection with the real estate *from the time when the fees, rents or charges are due.*" *Id.* § 15.2-5139 (emphasis added). The statute then further provided that the lien amount that may be placed on the property could amount to three or fewer months of delinquent rates or charges. *Id.* The statute unambiguously states that the lien arises "from the time when the fees, rents or charges are due." *Id.*

Under the plain language of the statutes that Defendants quote, the liens arose once charges became due. The statutes make clear that creation of a lien and enforcement of that lien amount to two different events. This parallels the manner in which courts treat other statutory liens. *See, e.g.,*

---

[3]     In statutory interpretation, the plain meaning of a statute's clear and unambiguous language binds Virginia courts. *Va. Dept. of Health v. NRV Real Estate, LLC*, 278 Va. 181, 187, 677 S.E.2d 276, 279 (2009). Further, a court will examine a statute in its entirety, rather than by isolating particular words and phrases. *Cummings v. Fulgham*, 261 Va. 73, 76, 540 S.E.2d 494, 496 (2001) (citing *Earley v. Landslide*, 257 Va. 365, 369, 514 S.E.2d 153, 155 (1999); *Ragan v. Woodcroft Village Apartments*, 255 Va. 322, 325, 497 S.E.2d 740, 742 (1998); *Buonocore v. C & P Telephone Co.*, 254 Va. 469, 472-73, 492 S.E.2d 439, 441 (1997)).

*In re Concrete Structures, Inc.*, 261 B.R. 627, 639 (E.D. Va. 2001) ("The statutory scheme, and the decisional law interpreting it, clearly bespeak that creation, perfection and enforcement [of mechanics' liens in Virginia] are distinctly different events."); *see also Harrison & Bates, Inc. v. Featherstone Associates Ltd. Partnership*, 253 Va. 364, 370, 484 S.E.2d 883, 886 (1997) (noting that Virginia's Mechanics' Lien Act provided for creation of a lien that could then be perfected through filing); *Hadrup v. Sale*, 201 Va. 421, 425, 111 S.E.2d 405, 407 (1958) (citing *Wallace v. Brumback*, 177 Va. 36, 41, 12 S.E.2d 801, 803 (1941)) ("[A]n inchoate lien attaches when work is done and materials furnished which may be perfected within the specified time frame."). Therefore, the charges becoming due created the liens.

Even assuming that the City did not comply with certain procedural requirements for recordation, no genuine issue exists with respect to the material fact that the City billed Bellkor for utility services. (Defs.' Mem. at 5.)  Further, Bellkor was delinquent on utility payments to the City.  (Decl. of J. David Folds in Supp. of Pl. Federal National Mortgage Association's Mot. for Summ. J. "Folds Decl.", Ex. B Dep. of C.G. Bellkor, LLC 84:13-16 (ECF No. 91-89).)  Again, these charges becoming due created the liens.  As a result, the creation of the liens is undisputed in this case.

B. The liens constituted a "transfer."

Because no dispute exists as to the liens' creation, the issue becomes whether a "transfer" occurred.  Plaintiff argues that creation of the liens constitutes a "transfer" occurred under the terms of the Security Instrument. (Pl.'s Mem. at 15-19.)  Defendants respond that because the City did not give appropriate notice and because the City recorded the lien amounts for more than a three-month period, no "transfer" occurred under the terms of the Security Instrument. (Defs.' Mem. at 9-12.)

For the reasons that follow, the Court first finds that a "transfer" occurred as defined under

14

the Note and Security Instrument. Second, Defendants did not take safe harbor in remedying the "transfer." Because a "transfer" occurred and because Defendants did not take safe harbor, Bellkor is personally liable under the Note.

        a.  The liens constituted a transfer under Section 21 of the Security Instrument.

      Any review of the Note and Security Instrument must begin with an analysis of the plain words of those contracts. In contract interpretation, Virginia courts adhere to the "plain meaning" rule. *Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983). A court in Virginia will not search for a contract's meaning beyond the contract itself when the contract "is complete on its face, [and] is plain and unambiguous in its terms." *Id.* (quoting *Globe Co. v. Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965)) (internal quotation marks omitted). Put simply, "contracts must be construed as written." *Ross v. Craw*, 231 Va. 206, 213, 343 S.E.2d 312, 316 (1986) (citing *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984); *Meade v. Wallen*, 226 Va. 465, 467, 311 S.E.2d 103, 104 (1984); *Magann Corp. v. Electrical Works*, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962)).

      Though generally non-recourse, the Note details in Paragraph 9 specific carve-outs that trigger Bellkor's personal liability. (Note ¶ 9 ("Except as provided in this Paragraph 9, Borrower shall have no personal liability under this Note . . . . Borrower shall become personally liable to Lender for the repayment of all the Indebtedness upon the occurrence of . . . a Transfer that is an Event of Default under Section 21 of the Security Instrument.").) The borrower will become personally liable upon "a Transfer that is an Event of Default under Section 21 of the Security Instrument." (*Id.* ¶ 9(c).) The Note plainly and unambiguously states the terms of personal liability.

      Section 21 of the Security Instrument defines certain events that constitute an "Event in Default." (Security Instrument § 21.) Section 21 defines an "Event in Default" as "a Transfer of all

or any part of the Mortgaged property or any interest in the Mortgaged Property." (*Id.* § 21(a)(1).) Section 21 does not specifically define the term "transfer." Rather, Section 1 — the definitions section — defines a "Transfer" as "the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law)." (*Id.* § 1(z)(B).) Creation of the liens caused a "transfer" to occur under Section 1 of the Security Instrument. By satisfying the definition of "Transfer" under Section 1, the liens constitute an event in default under Section 21 of the Security Instrument. Because the liens constitute an event in default under Section 21 of the Security Instrument, Defendant Bellkor faces personal liability under Paragraph 9 of the Note.

b. Defendants did not satisfy the safe harbor provision.

As stated above, Defendants will be held personally liable on the Note upon an event of default under Section 21 of the Security Instrument. Because the Court has already determined that the creation of the liens constituted an event in default under Section 21(a) of the Security Instrument, the issue becomes whether Defendants utilized the safe harbor provision in Section 21(b) of the Security Instrument.

Section 21(b) allows Defendants to avoid personal liability under the Note should the Defendants resolve the liens within thirty days. Section 21(b) provides that "the creation of a tax lien or a mechanic's, materialman's or judgment lien against the Mortgaged Property which is bonded off, released of record or otherwise remedied to [Fannie Mae]'s satisfaction within 30 days of the date of creation" does not constitute a "transfer." (Security Instrument § 21(b).)

Plaintiff argues that even though the Security Instrument contains a safe harbor that Defendants could have taken advantage of, Defendants failed to do so. (Pl.'s Mem. at 17-19.) Defendants contend that the safe harbor does not apply, because Section 21(b) does not specifically cover utility liens. (Defs.' Opp'n at 8.) Further, Defendants argue that the City's failure to follow certain procedural requirements in recordation renders the liens a "legal nullity," and, therefore, the

Court does not need to apply the safe harbor provision. (Defs.' Opp'n at 8.)

Section 21(b) of the Security Instrument defines certain events that do not constitute an event in default. One such event occurs with the creation of a tax lien that is bonded off, released or otherwise remedied within thirty days of creation. (Security Instrument § 21(b)(6).) Virginia law treats certain utility liens on par with property tax liens. *See* Va. Code §§ 15.2-2119, -5139 (stating that liens under those sections rank on parity with unpaid tax liens). Assuming that the recorded liens could fall under the safe harbor of Section 21(b)(6), the Court finds that Defendants did not satisfy the requirements under that section.

It is undisputed that the liens were created when the charges became due. Between August 5, 2011, and March 7, 2012, Bellkor failed to remain current on its utility payments to the City. (Folds Decl., Ex. A, Dep. of Pamela Fuschini 55:10-16 (ECF No. 91-89).) Further, Bellkor continued to be behind on payments throughout 2012. (Fuschini Dep. 59:18-23.) Because the charges becoming due created the liens, the liens existed throughout 2012.

Further, neither party disputes that Bellkor never bonded off, released or otherwise remedied the liens within the applicable thirty-day period. Because Defendants did not satisfy the requirements of Section 21(b), Defendants did not utilize the safe harbor provision.

C. Enforceability of the Guaranty against Bell.

The Court now turns to Defendant Bell's personal liability. On December 12, 2007, Bell validly executed the Note on behalf of Bellkor. (Pl.'s Mem. at 3.) Though generally non-recourse in nature, the Note details specific carve-outs in Paragraph 9 that give rise to Bellkor's personal liability. On that same day, Bell voluntarily executed a Guaranty to the Note. (Pl.'s Mem. at 4.) In the Guaranty, Bell "absolutely, unconditionally and irrevocably agree[d] to pay . . . all amounts for which [Bellkor] is personally liable under Paragraph 9." (Guaranty at 1.) Because a transfer occurred under Section 21 of the Security Instrument, Bellkor faces personal liability on the Note

17

pursuant to Paragraph 9.  Because Bellkor has personal liability under Paragraph 9, Bell faces personal liability under the terms of the Guaranty.

A guaranty exists as "an independent contract, by which the guarantor undertakes, in writing, upon a sufficient undertaking, to be answerable for the debt, or for the performance of some duty, in case of failure of some other person who is primarily liable to pay or perform." *McDonald v. Nat'l. Enters., Inc.*, 262 Va. 184, 189, 547 S.E.2d 204, 207 (2001) (quoting *B.F. Goodrich Rubber Co. v. Fisch*, 141 Va. 261, 266, 127 S.E. 187, 188 (1925)).  In an action to enforce a guaranty, a plaintiff must demonstrate: "(1) the existence and ownership of the guaranty; (2) the terms of the primary obligation; (3) default on the obligation by the primary obligor; and (4) nonpayment of the amount due under the guaranty contract." *Seminole Trail, L.L.C. v. Sheppard*, 2013 WL 3009319, at *3 (W.D. Va. June 17, 2013) (citing *McDonald*, 262 Va. at 184, 547 S.E.2d at 207).

In this case, no dispute exists as to the first requirement.  Defendant Bell agreed to be held personally liable.  (Defs.' Mem. at 2.)  Defendant Bell signed the Guaranty — attached to the Note — stating that he would "absolutely, unconditionally and irrevocably agree[] to pay to [Fannie Mae] all amounts for which [Bellkor] is personally liable under Paragraph 9."  (Guaranty at 1.)

No dispute exists as to the second requirement.  The Note details the terms of the primary obligation, and none of the parties contests the terms of the obligation.

No dispute exists as to the third requirement.  As detailed above, Bellkor defaulted on the primary obligation.  Paragraph 9 of the Note states that an event of default under Section 21 of the Security Instrument constituted an event of default on the Note.  (Note ¶ 9.)  As described above, the Court finds that a "transfer" occurred under Section 21 of the Security Instrument.  Bellkor defaulted on the primary obligation — the Note.

Finally, no dispute exists as to whether Defendant Bell made any payments under the

guaranty contract. Defendant Bell admitted that he "never made any payments to Fannie Mae under the Note." (Jonathan Bell's Objections and Resps. to Fannie Mae's First Set of Reqs. for Admiss. (ECF No. 91-86) at 5.) Therefore, because Bell signed a valid guaranty, Bell is personally liable for Bellkor's obligations under the Note.

D.  Amount Owed and Attorneys' Fees.

Having found that a "transfer" occurred and that Bellkor and Bell have personal liability on the Note, the issue now becomes the amount of the liability under the Note. Plaintiff argues that Defendants are liable for all amounts due under the Note. (Pl.'s Mem. at 14-19.) In the alternative, Plaintiff contends that Defendants are personally liable for misusing and misappropriating rents from the Property. (Pl.'s Mem. at 20-27.) Defendants counter that they neither misused nor misappropriated rents from the Property.[4] (Defs.' Opp'n at 9-13.) Further, Defendants argue that liability on the Note does not include attorneys' fees and costs. (Defs.' Opp'n at 13-15.)

On August 13, 2013, the parties filed a Joint Motion to Approve Agreement Regarding Plaintiff's Claim for Attorneys' Fees (ECF No. 116), agreeing that the parties would not raise any issues related to the amount and reasonableness of Fannie Mae's legal fees and expenses under Federal Rule of Civil Procedure 54 until after a resolution on the merits. On August 14, 2013, the Court entered an Order (ECF No. 121) granting the Joint Motion.

Finding that a "transfer" did occur under the terms of the Note and Security Instrument and that Bellkor and Bell are personally liable, the Court directs the parties to file supplemental briefs on the issue of damages consistent with the Court's rulings. Further, the parties will address any issues related to the amount and reasonableness of Fannie Mae's legal fees and expenses under Federal Rule of Civil Procedure 54. Plaintiff shall have fourteen (14) days from the date of this

---

[4]      Defendants' first argued that the City's failure to follow certain procedural requirements in recordation made the liens void *ab initio*, meaning that Defendants had no personal liability. (Defs.' Mem. at 9-12.) Because the Court has found that a "transfer" did occur and that Defendants have personal liability, the Court must address the extent of that liability as a final issue.

19

Memorandum Opinion to file its brief.  Defendants shall have seven days (7) from the date of

Plaintiff's filing to file their response.  Plaintiff shall have three (3) days from the date of

Defendants' filing to file any reply.

Further, Bell has seven (7) calendar days from the date of this memorandum opinion to

comply *fully* with this Court's Order (ECF No. 131) dated August 27, 2013.  Should Bell not fully

comply with that Order, this Court will issue an order to show cause as to why the Court should not

hold Defendant Bell in *criminal contempt* and sentence him to six months imprisonment.  *See* 18

U.S.C. § 401; 28 U.S.C. § 636(e)(3); Fed. R. Crim. P. 42(a)(1).

IV. Conclusion

For the reasons set forth above, the Court GRANTS Plaintiff's Motion for Summary

Judgment in part and DENIES Defendants' Motion for Partial Summary Judgment.  An order

consistent with this opinion shall be issued.

Let the Clerk file this Opinion electronically and notify all counsel accordingly.

_____  /s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: October 29, 2013